AEQUITRON MEDICAL, INC., Plaintiff,

v.

Joseph F. DYRO and Biomedical Resources, Inc., Defendants.

No. 96–CV–2187 JS.

United States District Court, E.D. New York.

March 13, 1998.

David B. Morse, Minneapolis, MN, for Plaintiff.

John M. DelliCarpini, Deer Park, NY, for Defendants.

### MEMORANDUM AND ORDER

SEYBERT, District Judge.

Plaintiff Aequitron Medical, Inc. ("Aequitron") brings this action against defendants Biomedical Resource Group, Inc. ("BRG") and its principal, defendant Joseph Dyro ("Dyro") alleging causes of action for trade libel, tortious interference with prospective business advantage and defamation after Dyro was retained as an expert witness for

certain plaintiffs in an underlying action against Aequitron for strict products liability. Pending before the Court is defendants' motion for summary judgment dismissing the action in its entirety. For the reasons set forth below, the defendants' motion is granted.

## FACTUAL BACKGROUND

Plaintiff Aequitron engages in the manufacture, sale and distribution of medical devices, including infant heart rate respiration monitors. Complt. ¶ 9. Aequitron's monitors are Class 2 prescription medical devices approved under applicable rules and regulations of the United States Food and Drug Administration and are used in connection with written prescriptions by physicians for infants who have been diagnosed as susceptible to infant apnea, commonly referred to as sudden infant death syndrome ("SIDS"). *Id.* ¶¶ 9–10. Aequitron manufactures its products in Minnesota and distributes them through various dealers and independent manufacturers throughout the United States, Canada and other international markets. *Id.* ¶ 11.

Defendant BRG is a sole proprietorship of defendant Dyro, who is engaged in biomedical research, investigation and consultation. Deft.'s 3(g) ¶ 1. Dyro is a biomedical engineer with a bachelor's degree in electrical engineering from the Massachusetts Institute of Technology, a masters degree in biomedical electronics from the University of Pennsylvania and a Ph.D. in biomedical electronics engineering from the University of Pennsylvania. *Id.* ¶ 2. He has been a certified clinical engineer since 1976 and is presently editor of *The Journal of Clinical Engineering. Id.* ¶ 2. In September 1994, Dyro resigned his full-time position as the Director of Biomedical Engineering at the State University Hospital in Stony Brook to pursue his expert consulting business. Plf.'s 3(g) ¶¶ 5–6.

In the early 1990s, Dyro was retained as an expert in two products liability lawsuits brought against plaintiff Aequitron, both lawsuits alleging that Aequitron's infant heart rate and respiration monitor Model 9200 was defective and caused the deaths of the infants in each case. Deft.'s 3(g) ¶¶ 4–5. These two cases were titled *Campbell v. Aequitron Medical, Inc.,* brought in Arkansas state court, and *Chruscinksi v. Khalsa,* brought in Arizona state court. *Id.* Dyro was retained in the *Campbell* matter in December 1992 and in the *Chruscinksi* matter in October 1993. Dyro Aff. ¶¶ 5, 6.

In connection with his retention in the above-referenced actions, on or about December 13, 1992, Dyro received the allegedly defective Model 9200 infant monitor from the attorneys for the plaintiffs in the *Campbell* action. Deft.'s 3(g) ¶ 6. Thereafter, Dyro conducted certain tests on the Campbell's infant monitor. *Id.* ¶ 7. In July 1993, Aequitron's counsel and an independent consulting engineer observed Dyro's testing of the monitor, at which time Dyro stated that the monitor's audible alarm was working properly. Plf's 3(g) ¶ 11. In August 1993, Dyro was then deposed in the *Campbell* matter and testified that the alarm on the infant heart monitor was properly functioning. *Id.* ¶ 13. Following this deposition, the Campbell's attorney instructed Dyro to continue testing the monitor. Dyro Aff. ¶ 8.

On May 3, 1995, Dyro videotaped another test of the *Campbell* monitor, in which Dyro stated his observations and opinions that the Campbell monitor failed to emit an audible alarm when respiration ceased. Deft.'s 3(g) ¶ 7. On May 8, 1995, Dyro then wrote to the Campbell's attorney describing the results of the May 3, 1995 testing. Dyro Aff. ¶ 9. On May 17, 1995, Dyro also wrote to the plaintiffs' attorney in the *Chruscinski* action informing her of the May 3, 1995 test results. Dyro Aff. ¶ 12. On July 11, 1995, Chruscinski's counsel requested a copy of the video, which was sent on August 15, 1995. Dyro Aff. ¶ 14. Dyro did not send the videotape to anyone other than these attorneys, nor has Dyro publicized or advertised the testing of the infant monitor. Deft.'s 3(g) ¶¶ 10–11. Aequitron claims that the attorneys in the *Chruscinksi* matter never asked Dyro to test the *Campbell* monitor. Plf's 3(g) ¶ 19.

During the time Dyro had possession of the *Campbell* monitor for testing, Aequitron maintained a factory recertification policy for all of its monitor products. Plf.'s 3(g) ¶ 14. The policy recommends that monitors be returned to Aequitron at least once every 12 months for a factory recertification. *Id.* Ae-

quitron claims that Dyro was aware of this policy, but subsequent to December 1992, he never returned the *Campbell* monitor to Aequitron for recertification. *Id.* ¶¶ 15–16. The *Campbell* monitor was last recertified by Aequitron in 1987. *Id.*

On June 28, 1996, Aequitron then commenced this action against Dyro claiming trade libel, tortious interference with prospective business advantage and defamation, as well as a claim for punitive damages. Specifically, plaintiff alleges that the May 3, 1995 videotape is false and misleading because (1) it fails to disclose that in the July 23, 1992 test of the same monitor, Dyro found that it was not defective; (2) Dyro had previously testified at his deposition that the audible alarm sounded properly; and (3) it fails to disclose that the monitor was never returned for factory recertification. Plaintiff claims that Dyro circulated the May 3, 1995 videotape in order to secure business as expert witnesses against Aequitron in other potential products liability cases.

## DISCUSSION

### I. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the law of the Second Circuit, a district court must weigh several considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim. *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (internal case citations omitted). First, the moving party carries the burden to demonstrate that no genuine issue respecting any material fact exists. *Id.* (citations omitted). Second, all ambiguities and inferences must be resolved in favor of the non-moving party. *Id.* Third, the moving party may obtain summary judgment by showing that no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight. *Id.* Finally, the trial court's duty is confined to issue-finding and does not extend to issue-resolution. *Id.*

In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. PLAINTIFF'S CLAIMS FOR TRADE LIBEL AND DEFAMATION

Plaintiff raises two claims against Dyro concerning the alleged falsity of the statements in the May 3, 1995 videotape: one for trade libel and one for defamation. Under New York law, trade libel is a form of defamation relating to the disparagement of a business's goods and requires a showing of false, defamatory statements published to a third party, malice and special damages. *Van–Go Transport Co. v. New York City Board of Educ.*, 971 F.Supp. 90, 98 (E.D.N.Y. 1997). To the extent the claim alleges an injury to the business's reputation and not the product, it is the libel *per se* form of defamation and special damages need not be shown. *Id.*

As to either form of defamation, it is a complete defense that the allegedly false and defamatory statements were protected by absolute privilege. *See Boice v. Unisys Corp.*, 50 F.3d 1145, 1149 (2d Cir.1995) ("Public policy requires that certain communications, though defamatory, are privileged, and may not serve as the basis for a defamation suit"); *Toker v. Pollak*, 44 N.Y.2d 211, 218, 376 N.E.2d 163, 166, 405 N.Y.S.2d 1, 4 (1978) (absolute protection is designed to ensure that the speaker's own personal interests, especially fear of a civil action, whether successful otherwise do not have an adverse impact upon their discharge of their function in the judicial proceeding). Whether the absolute privilege attaches to alleged defamatory statements is a question of law for the court. *Bensky v. Warden of City Prison*, 258 N.Y. 55, 60, 179 N.E. 257, 259 (1932).

Under New York law, "[i]n the context of a legal proceeding, statements by parties and their attorneys are absolutely

privileged if, by any view or under any circumstances, they are pertinent to the litigation." *O'Brien v. Alexander,* 898 F.Supp. 162, 171 (S.D.N.Y.1995) (citing *Grasso v. Mathew,* 164 A.D.2d 476, 564 N.Y.S.2d 576, 578 (3d Dep't 1991)), *aff'd,* 101 F.3d 1479 (2d Cir.1996). The test of "pertinency" is extremely broad and embraces "anything that may possibly or plausibly be relevant or pertinent with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Id.* (citing *Grasso,* 564 N.Y.S.2d at 578). Thus, statements uttered in the course of a judicial or quasi-judicial proceeding are absolutely privileged so long as they are material and pertinent to the questions involved notwithstanding the motive with which they are made. *Herzfeld & Stern, Inc. v. Beck,* 175 A.D.2d 689, 691, 572 N.Y.S.2d 683, 685 (1st Dep't 1991) (citations omitted); *see also Park Knoll Assoc. v. Schmidt,* 59 N.Y.2d 205, 206, 451 N.E.2d 182, 183, 464 N.Y.S.2d 424, 426 (1983) (citations omitted).

■ Moreover, and contrary to plaintiff's position, the absolute privilege attaches not only at the hearing or trial phase, but to every step of the proceeding in question, even if it is preliminary and/or investigatory. *Herzfeld,* 175 A.D.2d at 691, 572 N.Y.S.2d at 685. As noted in *O'Brien,* the absolute privilege has been applied not only to statements made in pleadings and in court, but also to statements made in: a letter from an attorney to subpoenaed witnesses; letters between attorneys and parties or communications by attorneys to the court; during offers of settlement by attorneys; during an attorney's examination of records pursuant to an order of discovery; by an attorney in a magazine article quoting from and restating the allegations of the complaint; in an information subpoena mailed to a plaintiff's employer. 898 F.Supp. at 171 (citations omitted).

■ The absolute privilege does not extend, however, to any communication made during the course of a litigation. For example, in *Schulman v. Anderson Russell Kill & Olick,* 117 Misc.2d 162, 458 N.Y.S.2d 448 (Sup.1982), a New York court found that absolute privilege did not apply to "an attorney's out-of-court communications to persons unrelated to litigation," where the attorneys made telephone calls and wrote letters to clients of the plaintiff accountant in a blanket effort to gather information about him. The court noted that the communications were directed to "persons wholly unconnected to the [lawsuit in question] in an alleged effort to elicit information and identify potential witnesses." *Id.* 458 N.Y.S.2d at 453. The decision in *Schulman,* however, is inapposite to the case at bar. As the court itself noted, had the firm proceeded to question Schulman's clients through formal depositions, the statements made may have enjoyed absolute privilege as they were relevant to the litigation. *Id.* 458 N.Y.S.2d at 453. There is no dispute in this case, on the other hand, that Dyro was deposed and retained to testify in the *Campbell* and *Chruscinski* litigations and was not "wholly unconnected" to the lawsuits.

■ The absolute privilege that attaches in judicial proceedings extends not only to judges, parties and their attorneys, but to witnesses as well. *Park Knoll,* 59 N.Y.2d at 209, 451 N.E.2d at 184, 464 N.Y.S.2d at 426; *Andrews v. Gardiner,* 224 N.Y. 440, 446, 121 N.E. 341, 343 (1918). The purpose of extending such immunity is not to benefit or protect the speaker, but to benefit the public by promoting the administration of justice. *See Park Knoll,* 59 N.Y.2d 205, 451 N.E.2d at 184, 464 N.Y.S.2d at 426. It should also be noted that a retained expert is more than just the average witness, but acts as an agent for the attorney whose reports to the attorney based on information from the client can be subject to attorney-client privilege. *See United States Postal Service v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156, 161 (E.D.N.Y.1994). Although the videotape was later disclosed to Aequitron's counsel and not subject to any attorney-client privilege (Sherrill Aff. ¶ 8), the Court finds that a retained expert's role in trial preparation and the privileges accorded to those experts weighs in favor of providing absolute immunity for statements made in the course of those preparations, so long as the statements are pertinent to the ongoing litigation. In this case, there is no doubt that the statements on the videotape were directly relevant and critical

to the plaintiff's claims in both the *Campbell* and the *Chruscinski* lawsuits.

In the present case, therefore, there is no dispute that the statements made in the May 3, 1995 videotape were made after the commencement of the *Campbell* and *Chruscinksi* lawsuits and that defendants were specifically retained in those actions to provide an expert opinion as to whether the product was defective. It also cannot be disputed that the subject matter of the videotape unequivocally relates to the issues in those litigations as to the experts' opinion regarding the proper functioning of the infant heart monitor. While Dyro's prior testing and deposition testimony would have been excellent fodder for cross-examination in those actions, they do not form the basis of a defamation or trade libel claim under New York law as they are absolutely privileged. The fact that the statements were made during trial preparation rather than in open court is of no moment, as the above-discussed cases clearly indicate. Accordingly, summary judgment on plaintiff's defamation and trade libel claims must be granted to the defendants.

### III. PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

In order to state a claim for tortious interference with prospective business advantage, a plaintiff must show: (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair or improper means; and (4) injury to the relationship. *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994) (citations omitted). In the present case, the plaintiff has utterly failed to provide a scintilla of evidence regarding any business relationship with a third party that was harmed as a result of Dyro's May 3, 1995 videotape. Defendants, on the other hand, have provided undisputed testimony that the videotape was sent only to the attorneys for the plaintiffs in the *Campbell* and *Chruscinksi* lawsuits. Accordingly, summary judgment is granted in favor of defendants on this claim as well.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to mark this case as closed.

SO ORDERED.