**WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.,**
Plaintiff,

v.

**L. Brent BOZELL, III, Media Research Center, Inc., d/b/a Parents Television Council, Parents Television Council, James Lewis, Mark Honig, and Various John and Jane Does, Defendants.**

No. 00 Civ. 8616(DC).

United States District Court,
S.D. New York.

May 24, 2001.

Kirkpatrick & Lockhart LLP by Eugene R. Licker, New York City by Jerry S. McDevitt, Terry Budd, Jason L. Richey, Curtis B. Krasik, Pittsburgh, PA, for Plaintiff.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP by Thomas A. Leghorn, New York City, Herge, Sparks & Christopher LLP by Robert Sparks, Jr., Linda Stiles Shively, McLean, VA, for Defendants L. Brent Bozell, III, Media Research Center, Inc., Parents Television Council, Inc., Mark Honig, and the John and Jane Doe Defendants.

Michael J. Quarequio, Fort Lauderdale, FL, for Defendant James Lewis.

## OPINION

CHIN, District Judge.

On January 25, 2001, in a Florida criminal court, fourteen year-old Lionel Tate was convicted of first-degree murder in the death of a six year-old girl. During the proceedings, Tate's attorney argued the "wrestling defense"—the boy was an avid fan of professional wrestling who was simply mimicking wrestling moves he had seen on television when he accidentally killed the girl. The defense was rejected. Lionel Tate was found guilty and sentenced to life in prison.

This death and the deaths of three other children prompted defendants in this case—self-proclaimed media "monitors," their executives, and Lionel Tate's attorney—to publicly attack plaintiff World Wrestling Federation Entertainment, Inc. (the "WWFE") and its highly successful wrestling programs, including the television show WWF SMACKDOWN! Defendants publicly blamed the WWFE and WWF SMACKDOWN! for the deaths of the four children. For example, one of the defendants publicly stated that "four children aged 4 to six years old[ ] have had their lives tragically cut short by peers who were emulating wrestling moves they learned by watching programs like WWF SMACKDOWN!" (Am.Compl.¶ 46). Certain defendants also posted a statement on the Internet alluding to the "sheer arrogance and irresponsibility" of the WWFE, referring to "news reports of four children having killed four children copycatting what they watched on television," and asserting that "[t]he finger is pointing directly to Smackdown!" (*Id.* ¶ 45).

In their amended complaint, the WWFE alleges that these and other statements made by defendants were false and defamatory. The WWFE contends, for example, that Lionel Tate and the other children could not have been influenced by WWF SMACKDOWN! because the show did not begin airing until *after* three of the inci-

dents had occurred and only two days before the fourth. The WWFE further contends that defendants made the false statements for commercial purposes—to raise funding for themselves. The WWFE alleges, for example, that defendants distributed a videotape to potential contributors attacking the WWFE and showing, without permission, excerpts of copyrighted broadcasts of WWFE events.

The WWFE sues defendants for, among other things, defamation, tortious interference with business relations, violations of the Lanham Act, and copyright infringement. Defendants move to dismiss the Amended Complaint, arguing, among other things, that their speech is protected by the First Amendment and that the WWFE has failed to state a claim with respect to any of its causes of action. Defendants contend that the statements are protected because they were made as part of a good faith effort to reduce the level of violence and sex on television and to promote "responsibility" in the entertainment media. Tate's attorney also moves to dismiss for lack of personal jurisdiction and on the grounds his statements were protected by the judicial proceedings privilege.

■ The First Amendment does, of course, protect public discourse on the subject of sex and violence in the media. Defendants are free to criticize the WWFE and to express the opinion that the WWFE's shows are excessively violent and not in society's best interests. What defendants may not do, however, is make false and defamatory statements. The First Amendment does not protect statements that are false and defamatory even if they are made in the context of a public debate about issues of general concern.

Here, the WWFE alleges, with specificity, that defendants made statements that were false and defamatory, that were made with malice, and that were made for commercial purposes—raising money and self-promotion. Assuming, as I must, that the allegations of the Amended Complaint are true for purposes of this motion, I conclude that the WWFE has stated claims upon which relief can be granted. Accordingly, and for the reasons set forth below, defendants' motions to dismiss the Amended Complaint are denied in all respects.

## BACKGROUND

### A. The Parties

The WWFE is a media and entertainment company. It markets products under the popular and successful World Wrestling Federation (the "WWF") brand. It began airing a television program entitled WWF SMACKDOWN! on August 26, 1999. (Am.Compl.¶ 30).

Defendant Media Research Center (the "MRC") is a non-profit corporation that purportedly seeks to "bring political balance to the nation's news media and responsibility to the entertainment media." (*Id.* ¶ 2). In 1995, the MRC established defendant Parents Television Council (the "PTC") as its entertainment division. The PTC's stated purpose is to monitor television programming and to denounce what it considers inappropriate programs. (*Id.* ¶ 15). At the end of 2000, the PTC became an independent non-profit corporation, organized under the laws of Delaware. (*Id.* ¶¶ 2–3). The PTC, however, continues to perform the same activities as it performed under the MRC. (*Id.* ¶ 3). The PTC claims to have approximately 625,000 members.

Defendant L. Brent Bozell, III, is the Chairman of both the MRC and the PTC. Defendant Mark Honig is the Executive

Director of the PTC.[1]

Defendant James Lewis is a defense attorney, residing in Florida. Lewis was defense counsel for fourteen year-old Lionel Tate in his criminal trial for the 1999 death of six year-old Tiffany Eunick. During the criminal proceedings, Lewis argued that Tate was "simply ... replicating what he saw being done by Sting, Hulk Hogan or The Rock, familiar names to wrestling aficionados." (Opp. Mem. Ex. A (Sentencing Order of Judge Joel T. Lazarus, *Florida v. Tate*, No. 99–14401CF10A, at 12)). Between September 1999 and May 2000, Lewis appeared on a number of television and radio programs, including "Dateline," "Leeza," MSNBC, Court TV, and CBS Radio, to discuss the Lionel Tate case and his defense. (*See, e.g.,* Am. Compl. ¶¶ 65, 66, 70, 71, 72, 73). On March 9, 2001, after having been found guilty of murder in the first degree, Lionel Tate was sentenced to life in prison.

## B. *The PTC's Campaign Against the WWFE*

In the summer of 1999, the PTC defendants began a campaign attacking the WWFE and WWF SMACKDOWN!, for what they perceived as the excessive violence and inappropriateness of plaintiff's programming. (*Id.* ¶ 28). The stated goal of the PTC's campaign was to "educate" its members and the WWFE's sponsors and advertisers to the purported fact that the WWFE and WWF SMACKDOWN! caused or was responsible for the deaths of four children. (*Id.* ¶ 23).

As part of its campaign to "educate" its members, the PTC engaged in the following: sending "Action Alerts" and "Urgent Grams" via the Internet; sending letters; publishing articles on its Internet website

and in the "PTC Insider," its newsletter; having Bozell write about the WWFE in his nationally syndicated column; and sending fundraising videotapes that focused on the WWFE and its products. With respect to "educating" the WWFE's corporate advertisers and sponsors, the PTC's campaign included: sending the corporations letters and videotapes; urging the PTC members to contact the corporations directly; speaking at the shareholders' meeting of the corporations; sending letters to politicians (the United States armed forces are advertisers); and advertising in newspapers.

## C. *The Allegedly Defamatory Statements*

Within these many communications, defendants made allegedly false and defamatory statements about the WWFE and its products. These statements fall into two categories: (1) statements asserting that the WWFE (and its programs, including WWF SMACKDOIWN!) "caused and/or is responsible for the deaths of four particular children" (*see, e.g.,* Am. Compl. ¶ 23); and (2) statements misrepresenting the number of corporate sponsors and advertisers who have "pulled" or "withdrawn" their support of WWF SMACKDOWN! (collectively, the "defamatory statements"). (*See, e.g., id.* ¶ 27).

An example of the first category is the following statement made by Bozell and posted on the Internet:

> The sheer arrogance and irresponsibility of the WWF while they line their pockets is frightening, especially when you have news reports of four children having killed four children copycatting what they watched on television. The finger

1. The MRC, the PTC, Bozell, and Honig are referred to herein, collectively, as the "PTC defendants."

is pointing directly to Smackdown! and they still don't care. You start flirting with the word evil at that point.

(*Id.* ¶ 45). Another example is a statement made by a PTC spokesperson at a meeting of shareholders of MCI, a WWF SMACK-DOWN! sponsor:

Again, I must stress to you stockholders that wrestling shows are having a deadly impact on our children. Four children have been killed by peers who were emulating wrestling moves they learned by watching children programs such as WWF Smackdown!. Four children, from 14 months to six years old, had their live[s] cut tragically short because of the effect wrestling had on their peers.

(*Id.* ¶ 91). The WWFE contends that the statements in the first category are false because neither it nor any of its programs was responsible for the deaths of any of the four children.

An example of the second category is the following statement made by Honig to shareholders of ConAgra, another sponsor of WWF SMACKDOWN!:

I am here to ask you: Does ConAgra plan to continue sponsoring WWF Smackdown! Or, will you decide, as have nearly 40 other major U.S. corporations, to make what is a socially and corporately responsible decision and stop sponsoring this trash?

(*Id.* ¶ 109). The WWFE contends that the statements in the second category are false because it was not true that "nearly 40" major corporations had decided to withdraw their advertisements from WWF SMACKDOWN!

Lewis is alleged to have "echo[ed]" the other defendants' "falsehood that WWFE was responsible for four children's deaths" on various television talk shows, including shows produced and broadcast in New York, when he purportedly knew the state-ments were false. (*Id.* ¶ 72; *see also id.* ¶¶ 65, 73). He is also alleged to have joined with the other defendants in a "conspiracy" to harm the WWFE and the WWF mark; the Amended Complaint notes that Lewis appears on a fund-raising video produced by the PTC defendants in which critical and allegedly false comments are made about the WWFE. (*Id.* ¶¶ 75–80).

### D. *This Action*

WWFE's first amended complaint sets forth thirteen causes of action: Lanham Act claims of trademark dilution, false description, and unfair competition; a claim of copyright infringement; and state law claims of defamation, tortious interference with existing business relations, tortious interference with prospective business relations, product disparagement and trade libel, and conspiracy to commit the foregoing.

The PTC defendants move to dismiss each count of the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Central to all of the PTC defendants' arguments is the contention that their allegedly defamatory statements were truthful and are protected by the First Amendment. The Court heard oral argument on the PTC defendants' motion to dismiss on April 26, 2001.

Defendant Lewis moves to dismiss the Amended Complaint pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure, arguing lack of personal jurisdiction and improper venue. In addition, Lewis argues that his statements are protected by the judicial proceeding privilege, as he purportedly made them in the context of his representation of Lionel Tate. Lewis's motion was taken on submission.

## DISCUSSION

In their motions to dismiss, defendants repeatedly assert that they were validly exercising their First Amendment rights, and that their statements, therefore, are not actionable. The WWFE, on the other hand, argues that the statements are false and were made with malice, and that they constitute commercial speech. Thus, according to the WWFE, defendants' statements are not entitled to First Amendment protection.

Because these constitutional arguments permeate these motions to dismiss, and because the First Amendment protection afforded defendants' statements shapes the level of scrutiny the Court is to apply to the WWFE's claims, I begin by analyzing the First Amendment issues and then I address each of the WWFE's claims separately.

### I. *The First Amendment*

The "robust" debate "encouraged by the First Amendment is bound to produce speech that is critical of ... those public figures who ... 'by reason of their fame, shape events in areas of public concern to society at large.'" *Hustler Magazine v. Falwell*, 485 U.S. 46, 51, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (quoting *Associated Press v. Walker*, 388 U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring)). As stated by Justice Frankfurter, "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures." *Baumgartner v. United States*, 322 U.S. 665, 673–74, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944).

Nonetheless, not all speech about a public figure is immune from sanction. *See Hustler*, 485 U.S. at 52, 108 S.Ct. 876. The Supreme Court has explained that "[f]alse statements of speech are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective." *Id.* Hence, the "breathing space" that is required between "freedom of expression" and "false factual assertions" is provided by the constitutional rule that "a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood ... only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

Here, there is little dispute that the WWFE, by reason of its fame and popularity, is a public "figure," or entity, that influences the television industry and the programming to which children are exposed. In turn, defendants have produced speech that is unflinchingly critical of the WWFE and its products, attacking "what they considered to be the excessive violence and crudity of ... WWFE's programs." (PTC Defs. Mem. at 2).

Defendants argue that its speech is precisely the sort of speech that is encouraged, and protected, by the First Amendment. Thus, according to defendants, their statements are not actionable. (*See id.* at 4). The WWFE, however, asserts that because defendants' statements are "defamatory falsehoods," and because it has overcome whatever First Amendment protection defendants' statements are entitled to receive, the statements are actionable.

Hence, a threshold issue for the Court is whether a reasonable fact-finder could conclude that defendants have exceeded the "breathing space" afforded them by the First Amendment. Specifically, drawing

all reasonable inferences in favor of the WWFE, I must determine whether the Amended Complaint sufficiently alleges that defendants' statements were false, defamatory, and made with "actual malice"—with knowledge that the statements were false or with reckless disregard of whether they were false.[2]

■ Because defendants' statements were part of a campaign to raise money and notoriety for the PTC, I must also determine whether they should be classified as commercial speech. As noted by the Supreme Court, the level of First Amendment protection afforded a party "depends on whether the activity sought to be regulated constitutes commercial or noncommercial speech." *Bolger v. Youngs Drug Prods., Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The Supreme Court has explained that commercial speech "occupies a 'subordinate position in the scale of First Amendment values.' ... Accordingly, it may be regulated in ways that might be impermissible in the realm of noncommercial expression." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758 n. 5, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (quoting and citing *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)). In other words, claims based on such speech are not subject to the "most rigorous [constitutional] scrutiny," as compared to, for example, claims based on political speech. *Cf. id.* (citing *Brown v. Hartlage,* 456 U.S. 45, 52–53, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982)).[3]

■ Thus, the First Amendment issues raise four areas for consideration: (a) whether defendants' statements constitute commercial or noncommercial speech; (b) whether the statements were false; (c) whether the statements were defamatory; and (d) whether the statements were made with malice.

### A. Commercial Speech

#### 1. Applicable Law

The Second Circuit has provided the following analysis of commercial speech:

The "core notion" of commercial speech is that "of speech which does no more than propose a commercial transaction." However, the mere fact that the speech

---

2. In reviewing a motion to dismiss, I must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In other words, it is not the Court's function to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient. *Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990).

3. In fact, in *Procter & Gamble Co. v. Amway Corp.,* 242 F.3d 539 (5th Cir.2001), the Fifth Circuit recently held that commercial speech is not even afforded the protection of the

"actual malice" requirement. The court concluded that Supreme Court precedent, "combined with the Court's plain statements that false commercial speech receives no [First Amendment] protection, foreclose us from importing the actual-malice standard from defamation into the law of false commercial speech." *Id.* at 557. *But see* 1 Robert D. Sack, *Sack on Defamation* 5–114 (3d ed.2000) (concluding that a public figure corporate plaintiff should have to satisfy the "actual malice" standard). While I am not eliminating the "actual malice" requirement from my analysis here—the Second Circuit has not addressed this specific issue, and, regardless, as discussed below, the WWFE has sufficiently pled this requirement—*Procter & Gamble* is an example of how courts have interpreted the Supreme Court's directive to afford commercial speech "less protection."

at issue "has an economic motivation" or is "conceded to be advertisement[ ]" is not by itself sufficient to convert that speech into "commercial speech." On the other hand, "advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech." Finally, in considering these different elements, we are mindful of the Supreme Court's general edict that where the communications at issue "are made in the context of commercial transactions" the speech is not accorded a higher level of constitutional protection under the First Amendment.

*New York State Ass'n of Realtors, Inc. v. Shaffer,* 27 F.3d 834, 840 (2d Cir.1994) (quoting *Bolger,* 463 U.S. at 66, 66–67, 68, 103 S.Ct. 2875).

■ Three factors are to be considered in determining whether speech is commercial: "(i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Procter & Gamble,* 242 F.3d at 552 (citing *Bolger,* 463 U.S. at 67, 103 S.Ct. 2875).

**2. *Application***

■ Applying these principles to the Amended Complaint, I hold that the WWFE has sufficiently alleged that defendants' statements constitute commercial speech for purposes of defendants' motions to dismiss. Defendants' speech surely is not pure commercial speech—"speech which does no more than propose a commercial transaction." *Bolger,* 463 U.S. at 65, 103 S.Ct. 2875 (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Con-*

*sumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). PTC's statements do more than merely propose commercial transactions, as the PTC attacks the extent to which the WWFE, and the entertainment industry as a whole, exposes children to violence.[4] At the same time, however, the Amended Complaint alleges that the statements go beyond merely expressing defendants' opinions on a matter of public concern. A reasonable finder of fact could conclude that the statements in question constituted commercial speech.

First, defendants have relied on their WWFE attacks, specifically their statements that the WWFE and its products caused the deaths of four children, to raise money for the PTC. The Amended Complaint alleges that the attacks are featured prominently in a fundraising video for the PTC. In addition, in their fundraising letters to the PTC's members, defendants consistently attack the WWFE and its products. Indeed, in mid to late 1999, Bozell boasted that the PTC's WWF SMACKDOWN! campaign had hurt the WWFE and had increased the PTC's fundraising revenue and given it increased notoriety. (Am. Compl. ¶ 51; *see also id.* ¶¶ 32, 33, 35).

Second, defendants also allegedly used the attacks on the WWFE to champion themselves and to raise the profile of the PTC. For example, defendants consistently made statements such as: *"When the PTC alerted* the Army, Navy, Air Force and Coast Guard to the content on Smackdown!, they all pulled their sponsorship . . . " (*id.* ¶ 102 (emphasis added)); "We're winning this battle! But *we must not let up* until Smackdown! can't get any spon-

---

4. The WWFE does not seek to restrain all of defendants' speech that is critical of the WWFE or its products, or that seeks to dissuade companies from advertising or sponsor ing the WWFE. Rather, the focus of the WWFE's suit is on defendants' allegedly false speech, and the damage it has caused the WWFE.

sors ... " (*id.* ¶ 52 (emphasis added)); "[M]ore than thirty corporation *contacted by PTC* have withdrawn their support of WWF Smackdown!...." (*Id.* ¶ 106 (emphasis added); *see also id.* ¶¶ 35, 111, 112, 114). Thus, the WWFE alleges that defendants "made these defamatory statements" not only to hurt the WWFE but also to increase "PTC notoriety" and "to deceive [the PTC] members into believing the PTC's efforts were more successful than they were ... so the members would keep financially supporting a 'successful' organization." (*Id.* ¶¶ 47, 100).

The combination of these characteristics—the goals of making money and self-promotion—support the WWFE's allegation that defendants' speech is commercial, notwithstanding the fact that their speech discusses public issues. *Cf. Bolger,* 463 U.S. at 67–68, 103 S.Ct. 2875 (finding that informational pamphlets were commercial speech even though they contained discussions of "important public issues"). In addition, application of the three-factor test set forth in *Procter & Gamble* supports the conclusion that the speech was commercial: the statements were part of what could fairly be characterized as advertisments; the communications referred to specific products or services—the WWFE's programs, including WWF SMACKDOWN!, as well as defendants' services and programs; and defendants had an economic motivation for their statements—raising money and self-promotion. *See Procter & Gamble,* 242 F.3d at 552.

Consequently, I conclude that a reasonable fact-finder could find that defendants' speech is commercial speech. *See Bolger,* 463 U.S. at 65, 103 S.Ct. 2875. Thus, although on a motion to dismiss the Court already draws all reasonable inferences in favor of the plaintiff, I shall be further mindful—for purposes of these motions—that defendants' statements may only be entitled to "reduced [First Amendment] protection." *Dun & Bradstreet,* 472 U.S. at 758 n. 5, 105 S.Ct. 2939; *see also Central Hudson,* 447 U.S. at 563, 100 S.Ct. 2343 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."); *Procter & Gamble,* 242 F.3d at 546 n. 12 ("The First Amendment affords less protection to commercial speech and none to false commercial speech." (citing *Virginia State Bd.,* 425 U.S. at 771–72, 96 S.Ct. 1817)).[5]

### B. *Falsity*

■ Throughout its Amended Complaint, the WWFE asserts that defendants' allegedly defamatory statements are false. For example, the Amended Complaint alleges that defendants repeatedly made statements alleging that four children were killed by other children who were emulating wrestling moves they learned by watching programs such as WWF SMACKDOWN! The Amended Complaint alleges that these statements were false because the children were not emulating wrestling moves, and WWF SMACKDOWN! did not begin to air until after three of the incidents had occurred.

---

**5.** Even if I were to consider defendants' speech as "noncommercial," I would still deny these motions to dismiss. Even if defendants' statements were afforded full First Amendment protection, that privilege would not be absolute. Absolute privilege under the First Amendment is "powerful medicine" and is granted only in limited situations, such as, for example, in connection with the privilege for judicial proceedings; the privilege for legislators; the spousal privilege; and sovereign immunity. 1 Sack, *supra,* at 8–4 to 8–48. As discussed below, the Amended Complaint sufficiently alleges that defendants' statements are false and were made with actual malice. Thus, defendants' allegedly defamatory statements, under any level of scrutiny, are actionable.

The Amended Complaint alleges, in the case of Lionel Tate, that he never stated that he was emulating wrestling moves and that in fact he had told police he was playing "tag."

In addition, the Amended Complaint refers to press releases distributed by the PTC defendants to politicians and corporate sponsors in which they listed "corporate giants" who had "withdrawn their support of WWF Smackdown!" (*See, e.g.,* Am. Compl. ¶ 106). These releases represented, at various times, that "more than thirty," "nearly 40," and "35" major corporations or sponsors had cancelled their advertisements on, or stopped sponsoring, WWF SMACKDOWN! The WWFE alleges that these statements were false because "[m]any of the companies listed in the PTC Press Releases ... never advertised on WWF SMACKDOWN!, a fact PTC and Bozell knew," and because the number of sponsors who discontinued their advertisements never reached the levels alleged by defendants. (*Id.* ¶¶ 107, 113).

The Amended Complaint sufficiently alleges falsity.

### C. *Defamatory Meaning*

■ The gravaman of a defamation action is an injury to reputation. A defamatory statement is one that exposes an individual (or an entity) "to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[s] an evil opinion of one in the minds of right-thinking persons...." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir.2000) (quoting *Kimmerle v. New York Evening Journal*, 262 N.Y. 99, 102, 186 N.E. 217 (1933)).

■ Here, the Amended Complaint alleges statements that are reasonably susceptible of defamatory meaning. A reasonable fact-finder could conclude that

defendants' statements blaming the WWFE for the deaths of at least four children exposed the WWFE to shame and disgrace. Many of defendants' statements were even more explicit, outrightly accusing the WWFE of engaging in conduct that was "criminal" and "criminally irresponsible." (Am.Compl.¶ 35). Another statement accused the WWFE of "sheer arrogance and irresponsibility" and engaging in conduct that was "flirting with the word evil." (*Id.* ¶ 45). These statements were surely damaging to the WWFE's reputation.

The Amended Complaint sufficiently alleges defamatory meaning.

### D. *Malice*

■ To prove actual malice, a plaintiff must prove that the defendant "had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity." *Celle*, 209 F.3d at 182 (quoting *New York Times*, 376 U.S. at 280, 84 S.Ct. 710). " 'Malice' in its common-law sense is generally defined as spite, ill will, hatred, or the intent to inflict harm, or ... a reckless disregard of the [defamed party's] rights and of the consequence that may result to him." 1 Sack, *supra*, 9–32 to 9–33 (internal quotation and citations omitted).

■ Throughout the Amended Complaint, the WWFE alleges that defendants knew that their statements were false and that they uttered them with malice. (*See, e.g.,* Am. Compl. ¶ 47 ("PTC, Bozell and Honig all knew or should have known through reasonable investigation that there is no evidence that WWFE and/or WWF SMACKDOWN! caused the death of any of the four children."); *id.* ¶ 107 ("PTC, Bozell and Honig all knew or should have known that at that time more

than thirty corporations had not 'withdrawn their support of WWF SMACK-DOWN!' or 'pulled their ads.' Many of the companies listed in the PTC Press Releases ... never advertised on WWF SMACK-DOWN!, a fact PTC and Bozell knew."); *id.* ¶ 50 (alleging that defendants "have published all of the above mentioned concocted and malicious lies both to raise funds from the public for the PTC and to interfere with WWFE's sponsors and advertisers and to tarnish WWF's mark, all with the willful intent to harm WWFE.")).

▉ Actual malice "typically" will be inferred from "objective facts," *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir.1982), and here the Amended Complaint alleges objective facts from which one can reasonably infer both *New York Times* malice as well as common law malice—that defendants acted with spite, ill will, hatred, or the intent to inflict harm. The death of the 6–year old girl in the Lionel Tate case occurred on July 28, 1999, and the death of the 3–year old boy in North Dallas occurred even earlier, on May 27, 1999. (Am.Compl.¶ 35). Yet, defendants attributed the deaths of these two children to the show, even though WWF SMACK-DOWN! did not air until August 26, 1999. (*Id.* ¶ 30). Moreover, defendants used words like "criminal," "criminally irresponsible," and "evil." Then, in an effort to persuade advertisers not to advertise on WWF SMACKDOWN!, defendants publicly stated that as many as 40 major corporations had already withdrawn their sponsorship when that apparently was not true. A reasonable fact-finder could certainly infer reckless disregard for the truth and/or

spite, ill will, and an intent to harm from these and other objective facts.

In short, the WWFE has sufficiently alleged that defendants' statements were false, defamatory, and made with actual malice. *See Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir.2001) (noting that resolution of "falsity and actual malice inquiries typically requires discovery" and, therefore, should not be resolved at pleadings stage). In addition, the WWFE has sufficiently alleged that defendants' speech should be classified as commercial speech that is not entitled to heightened constitutional protection. Against this background, I now separately address each of the WWFE's claims.

## II. *Plaintiff's Claims*

Because the WWFE relies on its federal claims to invoke this Court's subject matter jurisdiction, I begin with an analysis of WWFE's Lanham Act and Copyright Act claims. I then consider the claims under state law.

### A. *Lanham Act*

Based on defendants' allegedly defamatory statements,[6] the WWFE has asserted claims of trademark dilution against all defendants and claims of false description and unfair competition against the PTC defendants. As a threshold argument, the PTC defendants argue that the Lanham Act is not implicated here at all because their use of the WWF mark was not used "in commerce" and their statements were true.

### 1. *Applicability of the Act*

▉ The Lanham Act's "use in commerce" requirement "is a jurisdictional

---

**6.** "Congress specifically amended the [Lanham] Act in 1989 to include commercial defamation claims." *Sepenuk v. Marshall*, No. 98 Civ. 1569(RCC), 2000 WL 1808977, at *5

(S.D.N.Y. Dec. 8, 2000) ("The crux of the dispute goes to whether the defendants made false representations as to the nature and quality of [defendant]'s goods and services.").

predicate to any law passed by Congress," and it is well settled that the requirement "is broad and has a sweeping reach." *Planned Parenthood Fed'n, Inc. v. Bucci,* No. 97 Civ. 629(KMW), 1997 WL 133313, at *3 (S.D.N.Y. March 24, 1997) (citing *Steele v. Bulova Watch Co.,* 344 U.S. 280, 283, 73 S.Ct. 252, 97 L.Ed. 319 (1952)), *aff'd,* 152 F.3d 920 (2d Cir.1998). The Lanham Act is implicated here for three reasons. First, the Amended Complaint specifically alleges that defendants repeatedly made their statements regarding WWFE and WWF SMACKDOWN! as part of their efforts to raise money for the PTC from members all over the country. (*See, e.g.,* Am. Compl. ¶¶ 35, 47, 50, 56, 77). Second, defendants' conduct affects the WWFE's ability to attract and retain consumers, sponsors, and advertisers of its products. "[T]he effect of [defendants'] activities on *plaintiff's* interstate commerce activities would place defendant[s] within the reach of the Lanham Act." *Planned Parenthood,* 1997 WL 133313, at *3 (emphasis in original) (citing *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 669 (2d Cir.1968)). Third, defendants' use of the Internet (*see, e.g.,* Am. Compl. ¶¶ 32, 34, 43–46, 101, 112) also satisfies the Lanham Act's "in commerce" requirement. *See Planned Parenthood,* 1997 WL 133313, at *3 (citations omitted).

As to defendants' argument that the Lanham Act is not implicated here because their statements are true and, thus, not "false or misleading" as required by the Act, I have already explained that it is not appropriate to resolve this issue on a motion to dismiss. *Cf. Gordon & Breach Science Publishers S.A. v. American Inst. of Physics,* 859 F.Supp. 1521, 1531–32 (S.D.N.Y.1994). As discussed above, the WWFE has sufficiently alleged that defendants' statements are false or misleading. Hence, the Lanham Act is properly invoked.

### 2. *Trademark Dilution— § 43(c)*

■ To prevail on a claim of trademark dilution under § 43(c) of the Lanham Act, the plaintiff must establish that (i) its mark is famous within the meaning of the statute, and (ii) there is a likelihood of dilution. *NBA Props. v. Untertainment Records, LLC,* No. 99 Civ. 2933(HB), 1999 WL 335147, at *7 (S.D.N.Y. May 26, 1999). Here, there is no dispute that plaintiff's WWF mark is famous. The issue, therefore, is whether there is a likelihood of dilution as a result of defendants' conduct.

■ Under federal law, dilution can occur in two forms—blurring or, as we have here, tarnishment. *See id.* at *8. "Dilution by tarnishment occurs where the defendant uses the plaintiff's mark in association with unwholesome or shoddy goods or services." *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.,* 964 F.Supp. 733, 750 (S.D.N.Y.1997). As stated by the Second Circuit, "[t]he *sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 507 (2d Cir.1996).

■ Here, defendants' conduct has included the following: labeling WWFE's programming as "criminal" (Am. Compl.¶ 35); repeatedly holding the WWFE and WWF SMACKDOWN! responsible for the deaths of four children (*see, e.g., id.* ¶¶ 35, 37, 38, 39, 42); and insinuating that the WWFE is "evil." (*Id.* ¶ 45). Obviously, these statements portray the WWFE's products as "unwholesome or shoddy." In addition, as many of these statements were made to viewers, sponsors, and advertisers of the WWFE's products, defendants' actions likely tarnished the WWFE's reputation.

530

Hence, because the WWFE has sufficiently alleged that defendants have diluted its mark, defendants' motions to dismiss the dilution claims are denied.

### 3. False Description and Unfair Competition— § 43(a)

To make out a claim under § 43(a) of the Lanham Act, a plaintiff must show that the defendant: (1) made material misrepresentations about the nature or characteristics of either defendant's or plaintiff's goods or services; (2) used the false or misleading misrepresentations "in commerce"; (3) made the representations in the context of commercial advertising or commercial promotion; and (4) made plaintiff believe that it is likely to be damaged by the representations.[7] See Randa Corp. v. Mulberry Thai Silk, Inc., No. 00 Civ. 4061(LAP), 2000 WL 1741680, at *2 (S.D.N.Y. Nov. 27, 2000) (citations omitted). Here, the WWFE has sufficiently pled its § 43(a) claims for false description and unfair competition.

First, as already discussed, the Amended Complaint repeatedly alleges that the PTC defendants made material misrepresentations about the nature and characteristics of the WWFE's products or services.

Second, as already discussed, the PTC defendants's representations were used "in commerce."

Third, as already discussed, the Amended Complaint alleges that the PTC defendants' representations were made to "increase PTC fundraising and PTC notoriety." (Id. ¶ 47). The statements not only allegedly disparaged the WWFE and WWF SMACKDOWN!, it also promoted defendants' own product. Thus, this conduct constitutes commercial advertising or promotion. Cf. Sodexho USA, Inc. v. Hotel & Restaurant Employees & Bartenders Union, 989 F.Supp. 169, 172 (D.Conn. 1997) ("[T]o constitute 'commercial speech' as intended by § 43(a) ..., the challenged conduct does not only require disparagement of a service or product, it additionally requires that the defendant do so ... to promote its own service or product."); Gordon & Breach, 859 F.Supp. at 1542, n. 10 (finding that defendants' articles were not "commercial," but noting that the "situation we consider is distinguishable, of course, from that of [another case], which addressed the fundraising letters of a non-profit organization").

Fourth, the statements of the PTC defendants quoted in the Amended Complaint demonstrate that one of their goals was to damage the WWFE in a public way.

Accordingly, because the WWFE has sufficiently pled the elements of a § 43(a) claim under the Lanham Act, the PTC defendants' motion to dismiss the claims are denied.

### B. Copyright Act

To prevail on a claim of copyright infringement, a plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Arden v. Columbia Pictures Indus., Inc., 908 F.Supp. 1248, 1257 (S.D.N.Y.1995) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282,

---

7. Section 1125(a) of Title 15, which codified § 43(a) of the Lanham Act, provides, in relevant part: "Any person who ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of ... another person's goods, services, or commercial activities, shall be liable in a civil action...." 15 U.S.C. § 1125(a)(1)(B).

113 L.Ed.2d 358 (1991)). Here, the WWFE alleges that it is the owner of registered copyrighted works, including WWF SMACKDOWN! (Am. Compl.¶ 208), and that the PTC defendants "have copied portions of WWFE's copyrighted programming in Defendants' ... fund raising videos without authority or privilege." (*Id.* ¶ 210).

■ The PTC defendants argue that they used the WWFE's material "only for the purpose of criticism and that use is therefore within the bounds of the fair use doctrine." (PTC Defs. Mem. at 13). The argument is rejected. The use of the WWFE's copyright in the fundraising video was obviously not "only for the purpose of criticism." Among other things, the PTC defendants sought financial gains and an increase in notoriety. Moreover, the Second Circuit has explained that fair use "is a doctrine the application of which always depends on consideration of the precise facts at hand." *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916 (2d Cir.1994) (citations omitted). Hence, courts have found that fair use "is usually unsuited to summary disposition." *See, e.g., Byrne v. British Broadcasting Corp.*, 132 F.Supp.2d 229, 233 (S.D.N.Y.2001) (citing *Association of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 524 (2d Cir.1991); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260, 267 (S.D.N.Y.1997), *aff'd,* 150 F.3d 132 (2d Cir.1998)).

Accordingly, the WWFE has sufficiently pled a claim for copyright infringement,

and the PTC defendants' motion to dismiss the claim is dismissed.

As the WWFE's federal claims survive defendants' motions to dismiss, I turn now to plaintiff's remaining state law causes of action.

### C. State Claims

#### 1. Defamation—Libel and Slander

■ The WWFE concedes that it is a "public figure." Thus, to prevail on its defamation claims,[8] the WWFE must allege that defendants's statements were (1) of and concerning WWFE, (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either with knowledge of falsity or reckless disregard of the truth.[9] *See Church of Scientology*, 238 F.3d at 173. This analysis parallels the First Amendment analysis from above. The WWFE has sufficiently pled a *prima facie* claim of defamation. Accordingly, the PTC defendants' motion to dismiss the defamation claims is denied.

#### 2. Tortious Interference With Existing Contractual Relations

■ To state a claim for tortious interference with existing contractual relations, the plaintiff must show that a defendant intentionally procured a third-party's breach of an existing contract with the plaintiff. *See Atla–Medine v. Crompton Corp.*, 00 Civ. 5901(HB), 2001 WL 170666, at *7 (S.D.N.Y. Feb. 21, 2001) (citations omitted). Here, the WWFE has suffi-

8. The requirements for defamation claims of libel and slander are the same, except that libel requires a written publication and slander requires an oral statement. *Boule v. Hutton*, No. 97 Civ. 144(MGC), 2001 WL 314633, at *9 (S.D.N.Y. March 30, 2001).

9. As already noted, at least one appellate court has held that a public figure plaintiff need not satisfy the "actual malice" require-

ment for allegedly defamatory commercial speech. *See Procter & Gamble*, 242 F.3d at 557. Although the Second Circuit has not addressed this issue, I need not determine, at this stage of the proceedings, whether plaintiff must satisfy this requirement because, as already discussed, the WWFE has sufficiently pled actual malice.

ciently pled this claim. The Amended Complaint specifically alleges that "MCI pulled their advertising from WWF SMACKDOWN! as a direct result of Allen's defamatory statements made at the [shareholder] meeting and included in the PTC press release." (Am.Compl.¶ 93); *cf. Atla–Medine*, 2001 WL 170666, at *7 (dismissing claim of tortious interference with existing contractual relations because plaintiff "does not allege that [defendant] caused plaintiff's customers to breach their contracts").

### 3. *Tortious Interference With Prospective Business Relations*

To make out a claim for tortious interference with prospective business relations, the WWFE must establish four elements: (1) business relations with a third party; (2) defendants' interference with those relations; (3) defendants acted with the sole purpose of harming plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *See Atla–Medine*, 2001 WL 170666, at *8 (citing *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir.1994)). The WWFE alleges that defendants, through their allegedly defamatory statements, "intentionally interfered" with its business relations "by attempting to induce . . . third parties not to sponsor and/or advertise on the WWF SMACKDOWN! television program both at present and in the future." (Am. Compl.¶ 157). Moreover, the WWFE alleges injury. (*See, e.g., id.* ¶ 99 ("ConAgra announced that it would terminate its relationship with WWFE at the expiration of its current contract . . . as a direct result of Honig's defamatory statements. . . .")).

Thus, the WWFE has sufficiently pled its claim for tortious interference with prospective business relations, and the PTC defendants' motion to dismiss the claim is denied.

### 4. *Trade Libel*

To state a claim for trade libel, which "is a form of defamation relating to the disparagement of a business's goods," the WWFE must allege that defendants (1) made false, defamatory statements, (2) to a third party, (3) with malice, and (4) that it suffered special damages. *Aequitron Med., Inc. v. Dyro*, 999 F.Supp. 294, 297 (E.D.N.Y.1998) (citation omitted). As I have already found that the WWFE has sufficiently pled the requirements for a claim of defamation, this claim too survives.

### 5. *Conspiracy*

Although New York law does not recognize an independent tort of conspiracy, "[i]f an underlying, actionable tort is established, . . . plaintiff may plead the existence of a conspiracy . . . to demonstrate that each defendant's conduct was part of a common scheme." *Sepenuk*, 2000 WL 1808977, at *6. To establish its claim of civil conspiracy, the WWFE must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *See Ivy Mar Co., Inc. v. C.R. Seasons, Ltd.*, No. 95 Civ. 508(FB), 1998 WL 704112, at *17 (E.D.N.Y. Oct. 7, 1998) (citation omitted).

The Amended Complaint sufficiently pleads a claim for civil conspiracy. As discussed above, the WWFE has sufficiently pled the underlying primary torts of defamation, trade libel, and tortious interference with prospective business relations. In addition, the WWFE has satisfied the remaining elements of a civil

conspiracy claim: the Amended Complaint alleges that each of the defendants—Bozell, Honig, Lewis, the MRC, and the PTC—committed specific overt acts in furtherance of their efforts to defame the WWFE; and, as a direct and proximate result, the WWFE "suffered commercial injury to its business, reputation and goodwill, including ... loss of advertising revenue...." (Am. Compl.¶ 226).

Accordingly, defendants' motions to dismiss the conspiracy claim is denied.

## III. *Defendant Lewis*

In his motion to dismiss the Amended Complaint, defendant Lewis raises two arguments that relate solely to him, and which require separate consideration. First, Lewis asserts that this Court lacks personal jurisdiction over him; he argues that he is a Florida resident who has no contacts with the Southern District of New York, and that New York's long-arm statute does not apply here because the WWFE's claims are grounded in defamation, which is beyond the statute's reach. Second, Lewis asserts that his allegedly defamatory statements are shielded by the judicial proceedings privilege; he argues that he made the statements concerning the WWFE in the context of his representation of Lionel Tate. Both arguments fail.

### A. *Personal Jurisdiction*

■■■ Lewis correctly notes that New York's long-arm statute for tortious acts committed within or without the state specifically excludes actions for defamation. *See* N.Y. C.P.L.R. § 302(a)(2) and (3). New York courts, however, "have permitted jurisdiction under § 302(a)(1) in defamation cases 'where the defamation complained of arises from or is connected with the transaction of business within the state....'" *Popper v. Monroe*, No. 87

Civ. 0899(SWK), 1990 WL 129168, at *3 n. 1 (S.D.N.Y. Aug. 29, 1990) (quoting *Legros v. Irving*, 38 A.D.2d 53, 327 N.Y.S.2d 371, 373 (1971)); *accord Montgomery v. Minarcin*, 263 A.D.2d 665, 693 N.Y.S.2d 293, 295-96 (1999) (noting that "personal jurisdiction over a nondomiciliary defendant in a defamation action has been sustained under CPLR 302(a)(1) where the action arises out of a defendant's transaction of business in New York").

■■■ Under C.P.L.R. § 302(a)(1), which provides a New York court with long-arm jurisdiction over a person who "transacts any business within the state," N.Y. C.P.L.R. § 302(a)(1), "[t]he key inquiry is whether defendant purposefully availed itself of the benefits of New York's laws." *Courtroom Television Network v. Focus Media, Inc.*, 264 A.D.2d 351, 695 N.Y.S.2d 17, 19 (1999). New York courts have held that a "nondomiciliary which takes advantage of New York's unique resources in the entertainment industry has purposefully availed itself of the benefits of conducting business in the State, such that long-arm jurisdiction may be asserted where the cause of action arises out of that transaction." *Id.* at 19–20.

Here, the WWFE alleges that Lewis took advantage of "New York's unique resources in the entertainment industry" on numerous occasions. (*See, e.g.,* Am. Compl. ¶¶ 65, 66, 70, 71, 72, 73). In addition, Lewis appeared in a fundraising video for the PTC, which was distributed to New York residents. (*See id.* ¶¶ 75–80). The WWFE alleges that during each of these media appearances, including the fundraising video, Lewis defamed the WWFE and its products. (*See id.*). Thus, based on Lewis's transactions of business in New York, out of which the WWFE's defamation action arises, this Court has personal jurisdiction over him pursuant to C.P.L.R. 302(a)(1).

534

## B. Judicial Proceedings Privilege

 Lewis also argues that his allegedly defamatory statements are covered by the judicial proceedings privilege and, thus, cannot form the basis of the WWFE's defamation claim. Specifically, he asserts that all of his statements were made in connection with the "judicial proceeding" of Lionel Tate in Florida. This assertion is incorrect.

 Under New York law, *"[i]n the context of a legal proceeding,* statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation." *O'Brien v. Alexander,* 898 F.Supp. 162, 171 (S.D.N.Y.1995) (emphasis added) (quoting *Grasso v. Mathew,* 164 A.D.2d 476, 564 N.Y.S.2d 576, 578 (1991)). The privilege does not apply, however, "to 'an attorney's out-of-court communications to persons unrelated to [the] litigation.'" *Aequitron Med., Inc. v. Dyro,* 999 F.Supp. 294, 298 (E.D.N.Y.1998) (quoting *Schulman v. Anderson Russell Kill & Olick,* 117 Misc.2d 162, 458 N.Y.S.2d 448, 453 (1982)). Communications directed to "persons wholly unconnected" to the lawsuit in question do not fall within the purview of the privilege. *Id.; see also O'Brien,* 898 F.Supp. at 171 n. 13.

Here, the WWFE alleges that Lewis made his defamatory statements on a number of radio and television programs. (*See, e.g.,* Am. Compl. ¶¶ 65, 66, 70, 71, 72, 73). Thus, the WWFE argues that the judicial proceedings privilege does not apply here. I agree. *See Willson v. Association of Graduates of United States Military Acad.,* 946 F.Supp. 294, 297 (S.D.N.Y. 1996) (denying application of the privilege because the statements were "allegedly made in a press conference"). Lewis did not make his allegedly defamatory statements in the context of Tate's trial; instead, he made them on programs such as "Leeza" and "Dateline" and in a PTC fundraising video, all of which were "wholly unconnected" to the trial. *Cf.* 1 Sack, *supra,* at 8–11 ("Statements to the press by a lawyer are not ordinarily privileged."). Accordingly, Lewis's statements are not privileged.

### *CONCLUSION*

The PTC defendants' motion to dismiss the Amended Complaint is denied in all respects.

Lewis's motion to dismiss the Amended Complaint is also denied in all respects.

The parties shall appear for a pre-trial conference on June 22, 2001, at 3 p.m., in Courtroom 11A, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York.

The WWFE's application for leave to file a Second Amended Complaint is granted, and the WWFE shall file its Second Amended Complaint on or before June 5, 2001. Defendants shall file their answers on or before June 18, 2001.

SO ORDERED.